1

P. "Mike" Palmer
18402 N. 19th Ave., #109
Phoenix, AZ 85023
602-513-3738 (cell)
Pro Se

2

3

FILED ____ LODGED
____ RECEIVED ____ COPY

OCT - 7 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ & DEPUTY

4

5

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

6

7

PETER MICHAEL PALMER,

8

Plaintiff

9

vs.

10

11

12

KENTON D. JONES, et al.

13

Defendants

**11-CV-1896-PHX-GMS**

**PLAINTIFF'S EMERGENCY
MOTION FOR RECONSIDERATION
OR ALTERNATIVELY
MOTION FOR CLARIFICATION
OF JUDGE SNOW'S
DENIAL OF TRO**

(Title 42 U.S.C. §1983)

14

15

16   Pursuant to LRCiv 7.2(g), citing manifest error & new evidence; and in the

17   interest of justice & judicial economy, Plaintiff moves Judge Snow to reconsider and

18   reverse his Order denying Plaintiff's Temporary Restraining Order (Doc. 4). Or,

19   alternatively, to state for the record where "Plaintiff has not met the burden of

20   Fed.R.Civ.P 65(b)." (Id. p2, line 7) This Motion is supported by the following

21   Memorandum of Points and Authorities as well as Plaintiff's recently filed Zeroth

22   Amended Complaint[1] ("ZAC," Doc. 5)

23   The need for emergency consideration continues by extension since TRO's are

24   emergency matters and because Plaintiff's life is in danger every day the status quo is

25   not restored, every day he is deprived of his right to defend himself, his loved ones, or

26   his fellow man. There is real, literal potential irreparable harm here. In fact, this past

27   Sunday, there were two reported murders in Phoenix, one within a mile of Plaintiff.

28

[1] Amended before Service

**OVERVIEW**

It occurs to pro se Plaintiff that suing the Justices of a state Supreme Court for constitutional violations may be a case of first impression and may set a precedent showing the Abstention Doctrine can never be an option in such a matter and a federal court must always take jurisdiction in such a matter.

The Court has denied granting Plaintiff a TRO in this matter, ultimately choosing to abstain from exercising jurisdiction, citing *Railroad Comm 'n of Texas v. Pullman Co.* Ignoring for now that *Railroad* is yellow-flagged on *Westlaw* and is not on point for this instant matter [EN1], abstention is not an option. Plaintiff will show that the Court's decision to abstain in this unique matter, with these unique defendants, violates an axiom of jurisprudence and is, therefore, illogical. Not only in theory, but in practice. Therefore, the Court's ruling cannot be correct and must be reconsidered.

Once Plaintiff has shown that error, Plaintiff will politely point out other manifest errors in the Court's Order, to aid the Court's reconsideration to grant Plaintiff his requested TRO.

Because the Standard of Review to issue a Preliminary Injunction is essentially the same as for a Temporary Injunction, it seems best to make a motion for reconsideration now, in the interest of judicial economy, since, if unchallenged, the Court will likely make the same ruling in the upcoming hearing for a Preliminary Injunction.

While Plaintiff can see that he may have to appeal to the Ninth on an Emergency basis for remedy, this need not be the case. For ironically, this same Court (GMS), just last month, granted a TRO for Arizona residents who also sued a branch of the state government, citing similar constitutional deprivations. But in that matter, this Court did not abstain. Nor did this Court tell those Plaintiffs to take their constitutional issues to the state judicial branch first. This Court took jurisdiction and applied the standard of review to grant a TRO. As both cases are the same in the abstract, both suing

government agents for harmful unconstitutional deprivations, this Plaintiff is at a loss to understand why he did not get the same outcome as the others. If the Court will not reconsider and grant Plaintiff a TRO, then I ask the Court to clarify the distinctions between the two cases.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Fatal Flaw, Part I

The Court's decision "to abstain from exercising its jurisdiction until the state courts have had the opportunity to [rule]" is fatally flawed and cannot stand because it violates an ancient axiom of jurisprudence.

It is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process."[2] Consistent with this, it is also axiomatic, and recently reaffirmed in the SCOTUS, that "no man is allowed to be a judge in his own cause." (Id.)

But this Court is telling Plaintiff to take this matter to the defendants he is suing, and let the defendants—who are judges—be judges in their own cause! Literally! This is not right!

Let's apply this to real life to see how it would work in a recent high profile case in the District of Arizona. Consider the ACLU's challenge to Arizona's controversial SB 1070. Had the ACLU moved this Court for a Preliminary Injunction to stop SB 1070 (as, in fact, it did in Judge Bolton's court), this Court would tell the ACLU to take up its fight against SB1070 first with the Executive, exhausting its remedies there. (Perhaps by proving to the Executive that parts of SB1070 are unconstitutional? But of course, the Executive obviously believed SB 1070 was constitutional or else it wouldn't have approved it.) Or this Court would tell the ACLU to vote the Executive out of office and change the law that way. Or this Court would tell the ACLU to take its constitutional challenge of SB 1070 to the Arizona Supreme Court first. And only if those remedies

---

[2] *Caperton v. A.T. Massey Coal Co.* 129 S. Ct. 2252 (2009)

1  fail, then, and only then, will the federal court intervene.

2      But, quite properly, the judge in this District did not abstain from jurisdiction.

3  Nor did the judge in this District tell the ACLU to exhaust its remedies first by

4  challenging SB 1070 in the Arizona Supreme Court before going federal. (Which, in

5  contrast, is what this Court is telling me to do.) No, there were alleged federal

6  constitutional issues which were rightly tried in this District Court and upheld in the

7  Ninth Circuit. (I parenthetically add that the federal court blocked parts of SB 1070

8  before it went into effect, before anyone suffered actual harm. I will touch on this later

9  in discussing the Second Amendment and irreparable harm.)

10     One hopes even the defendant judges will see the illogic in this Court's abstention

11 ruling. For, by law (Rule 2.11 of the Arizona Code of Judicial Conduct), Defendants

12 must recuse themselves from sitting on this matter because they have a personal bias,

13 since they are the defendants I am suing.[3] And so both in theory and practice, there can

14 be no remedy at the state level when a state's highest court judges are sued for

15 constitutional violations. They cannot judge their own cause and consistent with this,

16 they are prevented from hearing their own case. As there is no higher court in the state,

17 suing a state's highest judges may make this case unique and a case of first impression,

18 making federal intervention mandatory.

19 **Fatal Flaw, Part II**

20     Further, this Court is saying that the defendant Justices should determine, for

21 example, whether they are in violation of Count Five for violating Article III of the

22 Arizona Constitution (Distribution of Powers) for making and enforcing a "law." I

23 respectfully submit that it makes no sense to ask a State court if it is violating the State's

24 _____

25     [3] Rule 2.11 (A) A judge shall disqualify himself or herself in any proceeding in
   which the judge's partiality might reasonably be questioned, including but not limited
26 to the following stances:

27  (1)     The judge has a personal bias or prejudice concerning a party or a party's
   lawyer, or personal knowledge of facts that are in dispute in the proceeding.
28

1   constitution.

2          The Judicial Branch is the only branch in Arizona government that has the

3   authority to rule as to what is constitutional or not. And the State Supreme Court is the

4   highest court in the state. But this federal court is ultimately telling Plaintiff that I must

5   first go to the Justices of the Arizona Supreme Court to see if they will rule as

6   unconstitutional a Rule they have already issued as constitutional. Again, to require the

7   defendant Justices to rule on whether they are obeying the state constitution is to allow

8   them to be judges in their own cause.

9          Besides, I've already challenged the Supreme Court on the unconstitutionality of

10  its unlawful rule in a public forum. Why would the result be any different in another

11  pubic forum, especially when they're being sued?

12          No, abstention is not viable here. There is no one in the state who can review the

13  actions of the state's highest court. Therefore, the federal court **must** take jurisdiction

14  whenever a state court is accused of making an unconstitutional law.

15  **Court narrowly focused**

16          If I may politely say, the Court did not articulate all the facts of this case in its

17  *Analysis* and has completely overlooked the 800 pound gorilla in the room. Namely, if I

18  read it right, the Court is narrowly focusing on only First Amendment issues while

19  totally ignoring the larger, 800 pound seminal issue of the Second Amendment

20  deprivation via the Arizona Supreme Court's ARPOP Rule 6(E)(4)(e)(2).

21          Pro se Plaintiff is learning to think like a lawyer and can kinda-sorta see the

22  Court's narrowly tailored point, that, ignoring the fact that defendants unlawfully

23  deprived me of my constitutional Second Amendment right—that if this were solely a

24  First Amendment issue—this matter might not yet be ripe for federal intervention

25  because I might be able to prevail challenging the Injunction in a state hearing, citing the

26  on-point cites from the SCOTUS and the Ninth (ZAC, para 26 & 27). If so, we might

27

28

1    not be here today.[4]

2        But this matter is ripe because defendants did, absent law, deprive me of my

3    Second Amendment right. This is incontrovertible and this is what makes this a federal

4    issue. Besides, the Arizona Supreme Court's unconstitutional rule affects all Arizonans,

5    making this ripe with public interest.

6    **Focusing on the Second Amendment**

7        From the Court's claim that I have not met the burden of Rule 65(b) (Doc. 4, p2,

8    lines 6-7), the implication seems to be that an unconstitutional Second Amendment

9    deprivation does not constitute irreparable harm. I will show later, based on a recent

10   ruling from this same Court granting a TRO for a similar unconstitutional deprivation,

11   that a Second Amendment must constitute irreparable harm, just as a Fourth or Fifth

12   Amendment deprivation was so deemed to negate portions of Arizona's SB 1070.

13       Perhaps the time is ripe for a court to rule on this. It was only recently that the

14   SCOTUS reversed the Liberal's belief that the Second Amendment was not a

15   fundamental, individual right but only attached to Militias. (*McDonald v. Chicago*.) So,

16   for the record, Plaintiff needs clarification from this Court in the form of a yes or no

17   ruling: Does an unconstitutional deprivation of one's Second Amendment right

18   constitute irreparable harm, especially when Plaintiff has changed his "course of

19   conduct" as a proximate result of being deprived of his right to keep and bear arms?

20   This is seminal to consideration of this instant TRO. (The court may wish to extend

21

22   _____

23        [4] But pro se Plaintiff does not concede the point. As I said in the complaint,
     Arizona Civil Injunction Against Harassment law is patently unconstitutional, at least
24   when invoked via an ex parte petition. (ZAC, para 61-64) Because there is no
     provision / remedy for recovery of costs to litigate or attorney fees, anyone who is
25   falsely accused of Harassment is likely to suffer irreparable harm. Nor is there equal
     protection under law. The system favors petitioner, who can file at no cost. As
26   documented in my complaint (Id.), I am not the only victim and it is in the public
     interest to enjoin defendants (and by extension, all Arizona judicial officers) from
27   granting ex parte Injunctions.

28

1  "harm" to a fellow citizen who may be harmed during an armed car-jacking if another

2  good citizen cannot help because he has been deprived of his constitutional right to bear

3  arms.)

4  **More ripe fruit**

5        Back to ripeness and the need for federal intervention: Counts Five, Six, Eight.

6  Ten, and Eleven, which are a proximate result of the Arizona Supreme Court's unlawful

7  Rule 6(E)(4)(3)(2) can only be resolved in federal court. There is no higher court in the

8  state that can hold the state Supreme Court accountable to la or adjudicate these matters.

9  **Public Interest**

10        Further, the motivation behind this federal suit is not simply to remedy my

11  constitutional rights to keep and bear arms in an Injunction, but, in the public interest, to

12  ensure no Arizonan suffers harm in the future. There is a huge element of public interest

13  here. This Court needs to intervene to order the Justices of the Arizona Supreme Court

14  to repeal its baseless ARPOP Rule 6(E)(4)(3)(2).

15        In fact, while writing this motion, Phoenix radio station KFYI talk show host

16  Mike Broomhead covered this story.[5] Nationally, this case has been reported on the

17  Internet by World Net Daily.[6] Arizona's Mr. Broomhead, having read the amended

18  complaint for himself, expressed his concern that, as a controversial radio talk show

19  host, he could find himself similarly facing an unconstitutional deprivation of his gun

20  rights simply because a listener got a judge to sign off on an ex parte petition.

21  **As to Clarification**

22        Given all the above, this Court's Order cannot stand. Naturally, Plaintiff desires

23  that this Court will reconsider and reverse itself and grant Plaintiff his TRO. But if it

24  does not, Plaintiff asks this Court to rehearse the Standard of Review for a TRO as it did

25  _____

26      [5] http://media.ccomrcdn.com/media/station_content/622/
100611_5_PM__1317951644_5067.mp3, starting at 27 minutes to end.

27

28      [6] http://www.wnd.com/index.php?fa=PAGE.view&pageId=351825

1   when it granted a TRO in a similar matter last month. And if it does not grant the TRO,

2   to clarify the reason(s) why not.

3        I refer the Court to *UNITED FOOD AND COMMERCIAL WORKER LOCAL 99*

4   *et al., v (Governor) Jan BREWER*, CV-11-921-GMS. (Exhibit A)

5        In *United*, as here, Arizona residents sued a branch of the state government in its

6   official capacity. Plaintiffs there sued the executive, whereas I am suing the judicial.

7   This Court accept jurisdiction in *United*. But not here.

8        At issue there was a state law which was to go into effect, that Plaintiffs alleged

9   was unconstitutional. Here, Plaintiff is challenging a "state 'law,'" already in effect,

10  promulgated and enforced by the judicial branch. (Which, on its face, according to both

11  common sense and Article III of the Arizona Constitution (Distribution of Power) is

12  patently unconstitutional. Pro se Plaintiff surmises it was never foreseen that a Supreme

13  Court would make and enforce a law, and this may be a first.) This Court accepted

14  jurisdiction in *United*. But not here.

15       In *United*, as here, Plaintiffs alleged a violation of a right enumerated in the Bill

16  of Rights. Even though Plaintiffs in *United* had not suffered harm (the law not having

17  been put into effect) this Court ruled that a "court may hear a constitutional challenge to

18  a law that has not yet been enforced when 'the plaintiff intends to engage in "a course of

19  conduct arguably affected with a constitutional interest" and that there is a credible

20  threat that the challenged provision will be invoked against the plaintiff.'"

21       Here, Plaintiff has, in fact, engaged in a course of conduct that has, in fact, been

22  affected with constitutional interests (ZAC para 6). Here, the threat has actually been

23  invoked against the Plaintiff. The Court accepted jurisdiction in *United*. But not here.

24       In *United*, the Court noted that "The loss of First Amendment freedoms, for even

25  minimal periods of time, unquestionably constitutes irreparable injury" and that "the

26  harms they would suffer should SB 1365 go into effect are irreparable per se."

27       This pro se Plaintiff is at a loss to understand how, if the loss of First Amendment

28

freedoms (for even minimal periods of time) constitutes irreparable injury, the same is not true for the loss of Second Amendment freedoms. Especially in light of this Court's observation from the above case that one does not have to **prove harm** but **that it is only likely**. ("that irreparable injury is likely in the absence of an injunction.") Especially since, as I've argued before, the result of not being able to defend oneself (or others) from violent crime can result in literal irreparable harm. Not only to Plaintiff but to the public.

In the above case, the Court took the time to rehearse the legal standards in issuing a Preliminary Injunction. And granted the Injunction. Here, the Court is silent, simply stating I have not met the burden of satisfying Rule 65(b). Unlike other federal judges in my research (Chief Judge Ted Stewart of the District of Utah, for example), this Court did not document any specific defects, nor offer guidance as to how this pro se can cure those defects. Here the Court simply jumps from "not met the burden of Rule 65(b)" to abstention.

I am at a loss to understand how two similar cases can have two antithetical outcomes, especially since, arguably, mine has more meat showing harm and unconstitutional deprivations. It the difference in the parties?

**Endnotes**

The Court may skip to the "Wherefore" if it wishes. What follows should be moot, since I have shown that abstention is not viable because state judges cannot be judges in their own cause. Nevertheless, because a right is deemed waived if no objection, and because an argument not raised in District Court is waived on appeal, for the sake of completeness in anticipation of an appeal:

**Taken if true, Part I**

It is my understanding, as a pro se litigant, that Plaintiff's "factual allegations are taken as true and construed in the light most favorable to the plaintiff." *Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir. 2009). But when I tell the Court, as a statement

of fact, that the ten day "expedited" hearing to challenge a civil Injunction against

Harassment is patently unconstitutional and therefore, not a remedy, this Court tells me

that's false. (Doc. 4, p2, line 26 to p3, line 6.) There are two issues here: 1) the fallacy

that truth will prevail in court and 2) the fallacy that ten days is enough time to gather

material evidence for a defense.

As to the first, while I suppose I should be pleased that this Court believes my

legal constitutional arguments (which ones? First Amendment? Second Amendment?)

should prevail if I challenged the Injunction in state, that is no guarantee and not a

viable remedy. This Court knows that courts are arbitrary and capricious. Sadly, our

justice system is often like a game of Poker. You can have the best hand. You can play

your cards just right. But you can still lose.

To wit, not even federal judges in different Districts agree on the constitutionality

of ObamaCare, even when considering the same arguments. Sometimes different

plaintiffs get different results from the same judge. Having a "legitimate basis" or

having the truth does not guarantee one will prevail in court. (Cf. Jesus v. Pilate.) I

proved this when I petitioned the Arizona Supreme Court to repeal it's unlawful Rule

6(E)(4)(e)(2). My "legitimate" argument was rejected, even though the Justices

acknowledged some of my arguments were worthy of consideration.

Further, challenging the lawfulness of Rule 6(E)(4)(e)(2) in any lower court is

pointless. A lower court cannot (and will not) invalidate a Rule made by the Supreme

Court.

As to the second fallacy, this Court knows that, if I had to appeal a lower court's

decision, appellate courts do not accept new evidence or new facts. A defendant has to

have ALL his ducks in the initial appearance to make them available on appeal. I have

already told this Court why ten days does not constitutionally qualify as "due process."

In my amended complaint, I added the fact that Mr. Bodine would have to move the

Arizona court for leave to Intervene (or something like that) because defendant Jones'

Injunction unlawfully modifies father's visitation rights. (See ZAC, FN 11 and Exhibit B, attached, for support.) As a new fact, I called Mr. Bodine the other day and asked him how long he thought it would take him to prepare such a motion. Never having done it before, he guessed "three weeks." Further, he travels a lot on business, so even if his ex-wife does not challenge his motion for leave to Intervene, it may be a while before a trial can be had where he can participate. And I would need to subpoena some of the adult children to be hostile witnesses, which takes time. As I told this Court in my complaint, there is no way a zealous defense can be mounted in ten days and Arizona's expedited hearing is illusionary.

Moreover, this Court has forgotten the realities of litigation. If I lose in the first round, it will cost me a few hundred dollars for a certified transcript of the court proceedings, a necessity in Arizona for an appeal. But there is no remedy to recover this cost from a petitioner if I prevailed in vacating the Civil Injunction. So an appeal automatically causes irreparable harm to Plaintiff. This violates due process and equal protection under law. (It's not equal because petitioner can file before the court at no cost or bond requirement, but doing so can automatically cost a "victim" hundreds of dollars to challenge. Michael Roth (of Quartzsite), cited in my ZAC, paid an attorney $1000 to defend a vacated Injunction.)

**Taken if true, Part II**

Along similar lines (and please forgive me if I am wrong. It is hard to read inflection in the written word), this Court seems to question my claim that my name has been placed in the FBI's NCIC database. (Not that it "will be placed" as the Court said, but it has been placed. (Doc. 4. p2, line 24).)

Again, I assumed the Court would take what I said as true and did not think it would be necessary to supply this evidence. But in case there is genuine controversy here, I supply Exhibit C, a copy of JP Judge Mary Hamm's "Notice to Sheriff of Brady Disqualification."

1       Please see the line "and should be assigned a positive Brady Record Indicator in

2 the Protection Order File of the National Crime Information Center database."

3       For the nth time, I point out that this is patently unlawful and a violation of my

4 constitutional right to due process, since I was never served with, nor found to be in

5 violation of, a Title 13 Criminal Order of Protection. There must be countless other

6 Arizonan who have been victimized by the Arizona Supreme Court because of this. The

7 federal court is the proper forum to stop the abuse.

8       Since putting my name in the database was the procedure in my first Injunction,

9 there is good cause to believe it is still procedure and has happened again.

10       Even if , despite all the arguments above there was somehow a viable remedy at

11 the state level to resolve all the constitutional claims here; or, even if, defendant Jones

12 were to vacate the Injunction against me, the damage has been done. The State does not

13 have the power to grant me an audit of the FBI's NCIC database, nor does the state have

14 the power to order the FBI to remove my name from the database if stuck there. As far

15 as I know, only a federal court can grant that remedy.

16 **Injunctions and province**

17       In its Order, this Court observed that "Injunctions against harassment are

18 generally the province of state courts." Further, this Court adds, "The Court, does not

19 necessarily know all the facts under which the state court determined that the injunction

20 . . . should issue. [sic] Thus, it cannot determine the extent, if any, to which Plaintiff is

21 suffering immediate and irreparable injury . . ." (Doc. 4, p3, lines 7-11)

22       While I understand this Court's reluctance to interlope in the usual province of

23 state courts—on the assumption that the court file in Prescott in this instant matter has

24 not been tampered with (as two witnesses have attested happened in my first

25 Injunction)—this Court **does** know "all the facts" that Judge Jones knows. For I included

26 Miss Thomas-Morgan's petition in my ZAC.

27       Since A.R.S. § 12-1809 requires a "series of acts," and since the Arizona

28

1  Supreme Court's Rules of Protective Order Procedure defines a series of acts as two

2  (See Rule E(1) in Exhibit B), and since the Standard of Proof requires the petitioner

3  (Thomas-Morgan) to prove her case at petition by "a preponderance of the evidence"

4  (Id. Rule 8(F)), and since this Court has already acknowledged the legitimacy of

5  Plaintiff's Constitutional arguments regarding protected speech, this Court can, in fact,

6  rightly rule to vacate the state court's Injunction if it wills.

7  **Endnote 1**

8      Even if this Court can abstain, *Railroad Comm 'n of Texas v. Pullman Co.* cited

9  by this Court, does not apply. Quoting the 7th Circuit, "We have abstained under Pullman

10 'when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of

11 the federal constitutional issue depends on the interpretation of the state law; and (3) the

12 law is susceptible "to an interpretation by a state court that would avoid or modify the

13 federal constitutional issue.'" . . . Even when these conditions are fulfilled, we are not

14 required to abstain, and, to the contrary, 'important federal rights can outweigh the

15 interests underlying the Pullman doctrine.'" (Citations omitted.) *THE HARTFORD*

16 *COURANT COMPANY v. American Lawyer Media, Inc. d/b/a The Connecticut Law*

17 *Tribune*, F.3d 83 (2nd Cir. 2004)

18     All three conditions must be met to abstain under Pullman. But here, there is no

19 lack of clarity. First, it is clear the Arizona Legislature did not give the Arizona Supreme

20 Court a law to deprive residents of their constitutional gun rights under A.R.S. § 12-

21 1809. It is equally clear that the Arizona Supreme Court is making up law, as even it

22 does not cite a lawful basis for Rule 6(E)(4)(e)(2) in its ARPOP. Therefore, there is

23 nothing to "interpret." Third, this is black letter (no) law. there is nothing for the state

24 court to "interpret." The Arizona Supreme Court was served notice in its public forum. It

25 is knowingly and willfully acting outside of any state law.

26     Therefore, there are important federal rights that outweigh the Pullman doctrine.

27 Abstention is not an option. This federal court needs to intervene.

28

**Wherefore,** Plaintiff asks this Court to:

A. Reconsider its Order denying the TRO,

B. Take jurisdiction in this matter,

C. As a minimum, restore the status quo by granting Plaintiff a TRO ordering defendant Judge Jones to amend the Civil Injunction, rescinding the unlawful Brady restriction,

D. Order defendant Judge Jones to order the Sheriff's Office to undo the "Positive Brady Indicator" against me in the FBI's NCIC database,

E. Grant the TRO ordering defendant Judge Jones to vacate the Civil Injunction, so as to un-chill Plaintiff's First Amendment rights.

If the Court will not reconsider its Order, then I ask the Court to clarify its Order stating that my petition for a TRO does not meet the burden of Fed.R.Civ.P. 65(b) by enumerating the defects in a Standard of Review, the latter which it has previously enumerated when granting a TRO in a similar matter.

I have not lodged a proposed order. It is not clear to me if one is required by LRCiv 7.1(b)(2). It appears to pro se Plaintiff that such a proposed order would be of no help, for whichever way the Court rules, it would need to write a somewhat extensive Order reviewing the Legal Standards for or against issuing a TRO. Failing to lodge a proposed order should not be a fatal error, per LRCiv 83.6.

SUBMITTED this __7__ day of October, 2011

By: _P. Michael Palmer_

P. Michael Palmer
18402 N. 19th Ave., #109
Phoenix, AZ 85023
602-513-3738

1

2  **Certificate of Service:**

3  Copies of the foregoing mailed via
   U.S. Mail on October 7, 2011 to:

4
   Judge KENTON D. JONES
5  120 S. Cortez St., Rm 203
   Prescott, AZ 86303
6

7
   Justice ROBERT M. BRUTINEL,
8  Justice JOHN PELANDER,
   Justice W. SCOTT BALES,
9  Vice Chief Justice ANDREW D. HURWITZ,
   Chief Justice REBECCA WHITE BERCH,
10
   all at
11
   1501 W. Washington St.
12  Phoenix, AZ 85007

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Slip Copy, 2011 WL 4434043 (D.Ariz.)
**(Cite as: 2011 WL 4434043 (D.Ariz.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
UNITED FOOD AND COMMERCIAL WORK-
ERS LOCAL 99 et al., Plaintiffs,
and
Arizona Education Association, et al.,
Plaintiff–Intervenors,
v.
Jan BREWER, in her capacity as Governor of the
State of Arizona, et al., Defendant.

No. CV–11–921–PHX– **GMS**.
Sept. 23, 2011.

Gayl T. Payton, New Orleans, LA, pro se.

Isaac Brown, III, Werstein Smith & Wilson, Dallas,
TX, for Defendant.

### ORDER

G. MURRAY SNOW, District Judge.

*1 Pending before this Court are Plaintiffs' Mo-
tion for Preliminary Injunction and
Plaintiff–Intervenors' Motion for Preliminary In-
junction. (Docs.14, 77). For the reasons stated be-
low, Plaintiff–Intervenors' Motion is granted and
Plaintiffs' Motion is dismissed as moot.

### BACKGROUND

An employee in the state of Arizona may au-
thorize his or her employer to withhold certain
amounts from the employee's pay and to transfer
those funds to a separate entity. Through such
payroll deduction programs, employees pay their
health care or other welfare benefit premiums to in-
surance companies, invest for retirement with banks
and financial institutions, make donations to charit-
able organizations, and pay dues to their unions. All
of these organizations are permitted to engage in
political activity, including lobbying, by using
money in their general operating fund. *See Citizens*

*United v. FEC,* —— U.S. ——, ——, 130 S.Ct. 876,
904, 175 L.Ed.2d 753 (2010).[FN1]

> FN1. Charitable organizations may lose
> their federal tax-exempt status if a
> "substantial part" of their activities include
> "carrying on propaganda, or otherwise at-
> tempting, to influence legislation." 26
> U.S.C. § 501(c)(3). Although there is no
> statutory or regulatory definition of what
> constitutes a "substantial part" of an organ-
> ization's activities, courts have found that
> less than 5% of an organization's activity is
> not substantial, while over 16.6% is sub-
> stantial. *See Seasongood v. Comm'r,* 227
> F.2d 907 (6th Cir.1955); *Haswell v. U.S.,*
> 205 Ct.Cl. 421, 500 F.2d 1133
> (Ct.Cl.1974).

On April 18 and 19, 2011, the Arizona House
and Senate passed Senate Bill 1365, the "Protect
Arizona Employees' Paychecks from Politics Act,"
2011 Arizona Session Laws, Chapter 251, which
Governor Janice K. Brewer signed into law on
April 26, 2011. The law amended Title 23, Chapter
2, Article 7 of the Arizona Revised Statutes
("A.R.S.") by adding section 23–361.02. The stat-
ute requires that organizations collecting funds
through checkoff payroll deductions either affirm to
the employers who process the deductions that none
of their general fund is used for "political pur-
poses," or specify the percentage of their general
fund so used. A.R.S. § 23–361.02(B). The law
defines "political purposes" to mean "supporting or
opposing any candidate for public office, political
party, referendum, initiative, political issue ad-
vocacy, political action committee, or other similar
group." *Id.* § 23–361.02(I). Employers may not de-
duct the percentage of an employee's contribution
used for political purposes without written authoriz-
ation from the employee; consent must be reauthor-
ized each year. *Id.* § 23–361.02(B),(C). An organiz-
ation receiving funds from payroll deduction that
spends more of its operating fund on political pur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4434043 (D.Ariz.)
(Cite as: 2011 WL 4434043 (D.Ariz.))

Case 2:11-cv-01896-GMS   Document 6   Filed 10/07/11   Page 18 of 30   Page 2

poses than the percentage it reported to the employer is subject to a minimum civil fine of $10,000. *Id.* § 23–361.02(D).

While the law is written to have general application to all payroll deductions, it explicitly exempts a number of types of deductions from its scope, including, among others, deductions for the benefit of charitable organizations and organizations that provide employee health care, retiree, or welfare benefits. *Id.* § 23–361.02(E). In addition, SB 1365 excludes from its definition of employee "any public safety employee, including a peace officer, firefighter, corrections officer, probation officer or surveillance officer." *Id.* § 23–361.02(H). As a result, no public safety employee union would be obliged to comply with the statute to obtain its dues through payroll deductions from public safety employees. The law is scheduled to go into effect on October 1, 2011. *Id.* § 23–361.02(A).

**\*2** On May 9, 2011, Plaintiffs United Food & Commercial Workers 99, et al. filed a complaint challenging SB 1365's companion legislation, SB 1363, as unconstitutional. (Doc. 1). Plaintiffs amended their complaint to allege that SB 1365 is also unconstitutional. (Doc. 8). Plaintiffs further moved for a preliminary injunction to prevent SB 1365 from going into effect. (Doc. 14). [FN2] This Court granted leave to the American Education Association and other unions to intervene as Plaintiffs. (Doc. 47). Plaintiff–Intervenors moved for a preliminary injunction on August 4, 2011. (Doc. 77). This Order considers the claims made in both Plaintiffs' and Plaintiff–Intervenors' motions.

> FN2. No injunction is sought against SB 1363.

## DISCUSSION

## I. SUBJECT–MATTER JURISDICTION AND RIPENESS

In their response, Defendants apparently incorporate the arguments made in their Motion to Dismiss on lack of subject-matter jurisdiction, lack of ripeness, and immunity from suit under the Elev-

enth Amendment to the United States Constitution. (Doc. 50). To the extent they do so, these arguments lack merit. Federal courts have subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs allege that SB 1365 is pre-empted by the Supremacy Clause of the U.S. Constitution, and Plaintiff–Intervenors allege that SB 1365 violates the First Amendment. (Docs.8, 52). The Court has jurisdiction to entertain constitutional challenges to state statutes. 28 U.S.C. § 1331. To the extent that the parties allege they may choose to restrict their own speech in order to comply with an unconstitutional law, the complaint is ripe for adjudication. *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1154–55 (9th Cir.2000) (holding that a court may hear a constitutional challenge to a law that has not yet been enforced when "the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff.") (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Finally, Plaintiff–Intervenors are seeking injunctive relief against the Attorney General to prevent him from enforcing an allegedly unconstitutional state law; such suits are not barred by the Eleventh Amendment because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). [FN3]

> FN3. In their Motion to Dismiss, State Defendants further argue that Governor Brewer, Secretary of State Bennett, and Director of the Labor Department Maruca are immune from suit under the Eleventh Amendment. (Doc. 40). Because Plaintiff–Intervenors have only sought a preliminary injunction against Attorney General Horne, it is not yet necessary to determine whether immunity protects the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4434043 (D.Ariz.)
(Cite as: 2011 WL 4434043 (D.Ariz.))

Case 2:11-cv-01896-GMS   Document 6   Filed 10/07/11   Page 19 of 30   Page 5

other parties. (Doc. 77).

## II. LEGAL STANDARD

To be granted a preliminary injunction, a plaintiff must establish four elements. A plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *see* FED. R. CIV. P. 65. The Ninth Circuit continues to analyze these four elements using a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011). The element of irreparable injury is not subject to balance; the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter,* 555 U.S. at 22 (emphasis in original). Should the moving party demonstrate a very high likelihood of injury, however, the likelihood of success on the merits may be relaxed. In such cases, an injunction may be granted when "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Wild Rockies,* 632 F.3d at 1135, quoting *The Lands Council v. McNair,* 57 F.3d 981, 987 (9th Cir.2008).

## III. MERIT OF CLAIMS

*3 Plaintiffs make three broad arguments regarding SB 1365. First, they argue that the statute is unconstitutional under the Supremacy Clause because it is pre-empted by the Labor Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA"). Next, they argue that the statute is impermissibly vague and overbroad. Finally, they claim that the statute is pre-empted by the Federal Election Campaign Act ("FECA"). (Doc. 14). Plaintiff–Intervenors argue that the law violates the First Amendment, both because it burdens protected political speech and it discriminates

on the basis of speaker and viewpoint. Next, they argue that the law violates the Fourteenth Amendment because its exception for public safety unions is not rationally related to a legitimate governmental interest. They also argue that the law imposes unconstitutional conditions on payroll deductions. They claim that the law violates the Contracts Clause of the United States Constitution. They also assert that the statute is unconstitutionally vague. (Doc. 77).

This Order addresses the First Amendment challenges in detail. Because the Court determines that Plaintiffs are likely to succeed in demonstrating that SB 1365 violates the First Amendment, Defendants are from enforcing it, pending determination on the merits. It will therefore not be necessary to discuss Plaintiffs' and Plaintiff–Intervenors' remaining claims.

The statute specifically exempts from its regulatory structure payroll deductions for contributions to charitable organizations; payments to organizations that administer healthcare, retirement, or welfare benefits; payment of taxes; and donations to unions' political action committees. A.R.S. § 23–361.02(E). Five types of public safety employees, including police officers, firefighters, corrections officers, probation officers, and surveillance officers, are exempted from the law's definition of "employee." *Id.* § 23–361.02(H). As a result, the burdens imposed by the law do not fall equally on similarly-situated groups. The law therefore violates the First Amendment by discriminating against "those wishing to express less favored or more controversial views." *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

Viewpoint discrimination occurs when the government burdens "speech by particular speakers, thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Service,* 572 F.3d 962, 970 (9th Cir.2009) (internal quotations omitted). Statutes engage in viewpoint discrimination when they place "special prohibitions on those speakers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

who express views on disfavored subjects." *R.A.V. v. St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys. v. F.C.C.,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

**\*4** A regulation that burdens speech may discriminate by viewpoint through its underinclusiveness—that is, because it fails to burden all similarly situated parties equally. In particular, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.' " *City of Ladue v. Gilleo,* 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (quoting *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Ass'n.,* ——— U.S. ———, ———, 131 S.Ct. 2729, 2740, 180 L.Ed.2d 708 (2011).

A recent Supreme Court case upholding a statute barring public sector employees from contributing to political action committees through payroll deductions includes instructive commentary on underinclusiveness. *See Ysursa v. Pocatello Educ. Ass'n.,* 555 U.S. 353, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009). The statute at issue in *Ysursa* prevented public-sector employees from using the payroll-deduction system to donate to any political action committee. I.C. § § 44.2001–07. The law only applied to public-sector employees and only prohibited them from using payroll deduction to donate to overtly political organizations. *Id.* It treated union and non-union employees identically, did not exempt particular unions, and did not change how union members paid their regular dues. *Id.* The Court reasoned that the statute was not subject to strict scrutiny, because "Idaho does not suppress political speech but simply declines to promote it through public employer checkoffs for political activities." *Ysursa,* 129 S.Ct. at 1099. The Court emphasized that the statute does not impose on First Amendment rights because it "applies to all organizations, to any deduction regarding political issues, applies regardless of viewpoint or message, applies to all employers, and it does not single out any candidates or issues." *Id.* at 1099 n. 3. The Court emphasized that the law's treatment of similarly-situated organizations (all of them overtly political organizations) was "evenhanded." *Id.* It further stated that, should the state enforce the ban in an uneven manner, the unions could bring a challenge to the law as it was applied, suggesting that such enforcement might violate the First Amendment. *Id.*

The law at issue here, however, places restrictions on an employee's ability to donate through payroll deductions to an organization that engages in political activity depending upon the identity of the organization receiving the donation. Employees may thus use payroll deductions to supply money to charitable organizations; banks, trusts, and organizations that administer retiree plans; or insurance companies or other organizations that provide health care or welfare benefits. A.R.S. § 23–361.02(E) (1–5). The Defendants do not dispute that such organizations may spend such funds for political purposes. Moreover, SB 1365 overtly exempts employees who typically are members of public safety unions from its regulations. *Id.* § 23–361.02(H). The functional result of SB 1365's numerous exceptions is that the burdens imposed by the law fall principally, if not solely, on unions collecting dues. Even then, they do not fall squarely on unions representing police officers, firefighters,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4434043 (D.Ariz.)
(Cite as: 2011 WL 4434043 (D.Ariz.))

Case 2:11-cv-01896-GMS   Document 6   Filed 10/07/11   Page 21 of 30   Page 5

corrections officers, probation officers, or surveillance officers. *Id.*

**\*5** Organizations that wish to use payroll deduction to fund their political activity but are not exempted from the statute are disadvantaged from doing so in at least three ways. First, the statute requires them to disclose to the employers of their constituents the maximum percent of the amount deducted that will be used for political activity. A.R.S. § 23–361.02(B). Second, the law imposes a minimum fine of $10,000 per occurrence if an organization exceeds that maximum percent. *Id.* § 23–361.02(D). Third, it requires the annual authorization of each employee to initiate or continue payroll deduction. *Id.* § 23–361.02(B). Exempted organizations are subject to no such requirements to receive payroll deductions subsidizing their political activity.

As the Court recognized in *Citizens United,* some disclosure requirements that may burden speech are subjected to something less than strict scrutiny. *Citizens United,* 130 S.Ct. at 915 (holding a statute requiring the identification of political contributors valid because the state demonstrated "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.") (quoting *Buckley v. Valeo,* 424 U.S. 1, 64, 66, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Of course, there are a number of distinctions between the permissible disclosure requirement discussed in *Citizens United* and the statute set forth here. First among them is that *Citizens United* made no suggestion that the state could compel some political speakers in a similar class to disclose their donors, while exempting other similarly-situated political speakers from such a requirement.

Second, unlike the provisions upheld in *Citizens United* or *Buckley,* the requirements of SB 1365 are forward-looking. They apparently require the non-exempt organizations to anticipate in advance the amount they intend to spend on political purposes for a given year. If they underestimate,

they are penalized a minimum of $10,000. A.R.S. 23–361.02(A),(D). This fine "serves to deter and may even preclude expression necessary to provide an immediate response to late-breaking events." *Grossman v. City of Portland,* 33 F.3d 1200, 1206 (9th Cir.1994) (internal quotations omitted). Since such organizations would be bound by estimates they must make long before the facts of any particular political season emerge with clarity, the provision places a $10,000 penalty on "speech in situations where the communication was not, or could not have been, prepared far enough in advance." *Arizona Right to Life Political Action Committee v. Bayless,* 320 F.3d 1002, 1008 (9th Cir.2003).

This fine, and the ceiling on spending that this fine enforces, is not a disclosure requirement. It is a financial burden that political speakers subject to the law may be required to pay to match the speech of their political opponents. The Supreme Court has held that adding costs to political speech relative to a political speaker's rivals represents "a special and potentially significant burden." *Davis v. Federal Election Comm'n,* 554 U.S. 724, 739, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008); *see also Arizona Free Enterprise Club's Freedom Club Freedom PAC v. Bennett,* —— U.S. ——, ——, 131 S.Ct. 2806, 2822, 180 L.Ed.2d 664 (2011).

**\*6** The Court, however, need not analyze whether the state, through a law written to be generally applicable and uniformly applied, could impose such burdens on collecting funds through the payroll deduction program for political purposes. The statute at issue is not generally applicable, and is not "evenhanded." *Ysursa,* 129 S.Ct. at 1099 n. 3. By imposing its burdens on the political speech of some unions and other organizations and not imposing like costs upon other similarly-situated unions, or on other organizations that can use the funds for political activity, the law is underinclusive and discriminates according to speaker. *City of Ladue,* 512 U.S. at 51. As such, the law is subject to strict scrutiny. Defendants do not argue that SB 1365 can survive strict scrutiny. Plaintiffs are therefore likely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to succeed on the merits of their claim that the law violates the First Amendment and is therefore unconstitutional.

The statute contains a severability clause, which provides that "[i]f any provision of this act or its application to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable." Ariz. Laws 2011, Ch. 251 § 3. Whether or not to enforce a severability provision "is of course a matter of state law." *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). In Arizona, determining whether a provision may be severed "requires ascertaining legislative intent." *Republic Inv. Fund v. Town of Surprise,* 166 Ariz. 143, 151, 800 P.2d 1259 (1990). A court may invalidate a law in its entirety if the valid and invalid portions are so interrelated as "to raise the presumption that the legislature would not have enacted the one without the other." *Campana v. Arizona State Land Dep't,* 176 Ariz. 288, 294, 860 P.2d 1341, 1347 (1993) (internal quotations omitted).

Here, to render SB 1365 viewpoint-neutral, it would be necessary to sever not merely the public safety exclusive provisions, but also the exemptions for donations to charitable organizations and to health, welfare and retiree benefit associations as well. A.R.S. § 23–361.02(E)(2–3),(H). As a result, every charity, health insurance company, bank, or investment firm that receives money through any Arizona worker's payroll deduction would need to start complying with the law's provisions by October 1. Such a law would be dramatically broader in scope than the one that the legislature in fact passed. Arizona courts have refused to strike unconstitutional exceptions to legislation when they conclude "that the legislature would not have enacted the statute without [the exception]." *In re Cesar R.,* 197 Ariz. 437, 441, 4 P.3d 980, 984 (1999). Striking only the exceptions and permitting

a much broader regulation would, "in effect, cause the court to legislate a blanket [regulation] that the [legislature] did not itself enact." *World Wide Rush, LLC v. City of L.A.,* 563 F.Supp.2d 1132, 1146 (C.D.Cal.2008). For this reason, the Court determines that it cannot sever the sections of the statute that make it likely Plaintiff–Intervenors will prevail on their claims.

## IV. IRREPARABLE HARM

*7 In addition to demonstrating a likelihood of success on the merits, Plaintiffs must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter,* 555 U.S. at 20 (emphasis in original). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). When the speech that is so burdened is political in nature, "[t]he harm is particularly irreparable." *Klein v. City of San Clemente,* 584 F.3d 1196, 1208 (9th Cir.2009). Since Plaintiff–Intervenors' claim implicates the core protections offered by the First Amendment, the harms they would suffer should SB 1365 go into effect are irreparable per se.

## V. BALANCE OF EQUITIES

The third preliminary injunction factor requires the court "to balance the interests of all parties and weigh the damage to each." *L.A. Memorial Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1203 (9th Cir.1980). At this step, "balancing the injury of a third party against plaintiff's" is frowned upon. *Id.*

As discussed above, Plaintiffs and Plaintiff–Intervenors have demonstrated that they are likely to suffer irreparable loss of core First Amendment rights. Defendants will suffer the hardship of both delay in the implementation of the law should it ultimately be found to be constitutional and delay in writing the rules that will implement the legislation. Defendants' harms are not substantial enough to tip the balance of equities against Plaintiffs and Plaintiff–Intervenors. The balance of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4434043 (D.Ariz.)
(Cite as: 2011 WL 4434043 (D.Ariz.))

Case 2:11-cv-01896-GMS   Document 6   Filed 10/07/11   Page 23 of 30   Page 7

equities weigh in favor of an injunction.

## VI. PUBLIC INTEREST

Determining whether an injunction is in the public interest "addresses impact on nonparties rather than parties." *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 974 (9th Cir.2002). In the First Amendment context, the public interest can tilt against an injunction in certain limited circumstances. *See, e.g., Hale v. Dep't of Energy,* 806 F.2d 910, 918 (9th Cir.1986) (safety and security of nuclear testing site may favor public interest over First Amendment claim). Ordinarily, however, courts have "consistently recognized the significant public interest in upholding First Amendment principles," even when the rights at stake are those of the parties and not the general public. *Sammartano,* 303 F.3d at 974. Moreover, employees and organizations who are not parties to this lawsuit would see their political speech burdened should the law go into effect. Since Plaintiff–Intervenors demonstrate that they are likely to succeed in showing that the law violates the First Amendment because it discriminates according to viewpoint, the public interest tilts in favor of an injunction.

## VII. SECURITY

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Although the plain language of the rule suggests that a bond is mandatory, the Ninth Circuit has held that it "invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Courturier,* 575 F.3d 1067, 1086 (9th Cir.2009). A district court need not require a bond "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir.2003). There is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on

its face. No bond will be required.

## VIII. OTHER CLAIMS

**\*8** The Court has read and considered the remaining claims, and the statute presents further questions beyond those discussed above. The preemption questions are serious and complex. However, since SB 1365, as a law of general application, could only be pre-empted as it applies to private sector employees covered by the LMRA and the NLRA, and since Defendants are, at any rate, enjoined from enforcing the law in its entirety on First Amendment grounds, it is unnecessary at this stage to determine such issues. For the same reason, the Court will refrain from ruling on the other claims, including those alleging that the law is impermissibly vague, imposes unconstitutional conditions, violates equal protection, is pre-empted by election law, and violates the Contracts Clause.

## CONCLUSION

Plaintiffs and Plaintiff–Intervenors have shown a likelihood that they will succeed in demonstrating that the law's exceptions render it underinclusive, and that it therefore discriminates according to viewpoint in violation of the First Amendment. The claims allege constitutional harms, which are necessarily irreparable. The balance of equities and the public interest likewise tilt in favor of enjoining a law that implicates core constitutional rights.

**IT IS THEREFORE ORDERED** that Plaintiff–Intervenors' Motion for a Preliminary Injunction (Doc. 77) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 14) is **DISMISSED AS MOOT.**

**IT IS FURTHER ORDERED** that Attorney General Horne is preliminarily enjoined from enforcing Senate Bill 1365, creating A.R .S. § 23–361.02.

D.Ariz.,2011.
United Food and Commercial Workers Local 99 v.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT B

# ARIZONA RULES OF PROTECTIVE ORDER PROCEDURE

Approved September 5, 2007 by Arizona Supreme Court
Effective January 1, 2008
Amended Sept. 16, 2008, effective Sept. 26, 2008
Adopted on a permanent basis effective Sept. 3, 2009
Amended Aug. 31, 2009, effective Sept. 26, 2009
Current with amendments as of Nov. 18, 2009

## Rule 1.  General Administration

### A.  Applicability of Rules

1.  *Scope of these Rules.* These rules govern the procedures in any Arizona court in all cases related to the issuance of an Order of Protection *See* A.R.S. § 13-3602, an Emergency Order of Protection *See* A.R.S. § 13-3624(C), an Injunction Against Harassment *See* A.R.S. § 12-1809, and an Injunction Against Workplace Harassment *See* A.R.S. § 12-1810.

2.  *Applicability of Other Rules.* To the extent not inconsistent with these rules, the *Arizona Rules of Family Law Procedure* (ARFLP) shall apply to protective order matters heard in conjunction with pending family law cases. In all other cases, the *Arizona Rules of Civil Procedure* shall apply when not inconsistent with these rules.

### B.  Definitions

1.  *Parties*

a.  *Defendant.*   The defendant is the person against whom the plaintiff or other appropriate party is seeking protection.

b.  *Plaintiff and Other Appropriate Requesting Parties.*

1)  *Plaintiff.*   The plaintiff is the person or other appropriate requesting party who files the petition for a protective order.

2)  *Other Appropriate Requesting Parties.*

a)  *Parent, Legal Guardian, or Legal Custodian of Minor.* If the person in need of protection is a minor, then the parent, legal guardian or person who has legal custody of the minor shall file the petition unless the court determines otherwise.  The petition shall name the parent, guardian, or custodian as the plaintiff, and the minor as a specifically designated person.

b)  *Third Party on Behalf of a Person Unable to Request an Order.* If a person is either temporarily or permanently unable to request an order, a third party may request an order of protection on behalf of the plaintiff. After the request, the judicial officer shall determine if the third party is an appropriate requesting party for the plaintiff.  *See* A.R.S. § 13-3602(A).

program, the judicial officer may set the matter for an Order to Show Cause hearing in addition to referring the matter to an appropriate law enforcement agency. *See* A.R.S. § 13-3602(N).

**Q. Change of Address.** Each party shall report any change of address or telephone number to the court, in order to permit notification of any scheduled hearing. If the plaintiff's address and telephone number are protected, any changes shall also be protected.

### R. Telephonic/Video Conference Proceedings

1. Upon request of a party or witness, or on its own motion, and upon finding that no substantial prejudice will be caused to any party by allowing telephonic or video conference testimony, the court may allow a party or witness to give testimony at any evidentiary hearing or trial, telephonically or by video conference, if the court finds, as to a party, that a party is reasonably prevented from attending the hearing or trial and the court finds, as to a witness, that the witness is either, a) reasonably prevented from attending the hearing or trial; b) would be unduly inconvenienced by attending the hearing or trial; or c) attendance in person at hearing or trial would be a burdensome expense to either the witness or a party.

2. Any documents a party wishes to introduce into evidence through a party or witness appearing telephonically or by video conference shall, where practicable, be provided in advance to the party or witness.

## COMMITTEE COMMENTS

**Rule 1(A).** These rules contain statutory references that may change from time to time, but the Committee determined it would be helpful to include the specific statutory references upon which the rules are based. Whenever the word "See" precedes a statutory reference in these rules, this means the cited statute directly supports the preceding text of the rule.

**Rule 1(B)(1)(d).** Crime Victims' Rights arise on the arrest or formal charging of the person or persons who are alleged to be responsible for a criminal offense against a victim. *See* A.R.S. § 13-4402(A).

**Rule 1(C)(5).** Immigrants and their children need and are entitled to the full protection of the law, including orders of protection, regardless of status. A denial of a protective order would be considered discrimination based on national origin which is specifically prohibited by law. *See* 18 USC §§ 2261 and 2262.

**Rule 1(E).** Matters other than family or domestic violence may be appropriate for alternative dispute resolution. These controversies should be considered separate from domestic and family violence issues. Recognizing that matters of domestic violence may impact the alternative dispute resolution, it is important that victims of domestic violence have an opt-out prerogative.

The Mediation and Domestic Violence Policy Adopted by the American Bar Association House of Delegates in July 2000, states: "RESOLVED, That the American

Bar Association recommends that court-mandated mediation include an opt-out prerogative in any action in which one party has perpetrated domestic violence upon the other party."

**Rule 1(F).**  A protective order shall never be used as a way to modify, amend, affect or diminish the parents' rights to custody, parenting time or access to children as previously granted in a custody decree or a parenting time order from a court of competent jurisdiction, unless the judicial officer makes either of the findings listed in subdivisions (1) and (2) of this paragraph.  Under the Violence Against Women Act III (VAWA III), foreign Orders of Protection that include child custody and/or child support do qualify for enforcement through the full faith and credit provision. *See* 18 U.S.C. § 2265.

**Rule 1(G).**  States that issue mutual protective orders may be at risk of losing federal funding. *See* Violence Against Women Act III, 42 U.S.C. § 379.6 (1994).

**Rule 1(M).**  The defendant shall be personally served because 1) personal service on the defendant satisfies the criminal notice requirement if a violation of the protective order is prosecuted under criminal statutes, and 2) unless the affidavit of service, acceptance of service or return of service shows personal service on the defendant, many sheriffs' offices, which are the holders of record, will not accept a protective order for purposes of Law Enforcement Protective Order Repository (LPOR)/National Crime Information Center (NCIC) entry.

**Rule 1(P).**  Before ordering defendants to domestic violence offender treatment programs, judicial officers shall review the information in *Domestic Violence Offender Treatment Programs and Offender Accountability*, noting especially that anger management programs and couple's counseling are not substitutes for domestic violence offender treatment programs. A list of Licensed Behavioral Health Facilities that provide Misdemeanor Domestic Violence Treatment Programs can be found by calling (602) 364-2595 or contacting the Arizona Department of Health Services, Division of Licensing Services, Office of Behavioral Health Licensing.

## Rule 2.  Fees and Costs

**A. Notice to Parties.**  The court shall provide notice to the parties of the filing and service fees listed below. *See* A.R.S. §§ 12-284, 12-1810, 12-2107, 22-281 and 22-404.

   1.  Filing fees:

      a.  *Petition for or Request to Modify Order of Protection/Injunction Against Harassment*  - no fee

      b.  *Petition for Injunction Against Workplace Harassment* - fee pursuant to A.R.S. §§ 12-1810 and 12-284(A)

      c.  *Petition to Request a Hearing for Order of Protection/Injunction Against Harassment/Injunction Against Workplace Harassment* - no fee

of the plaintiff or other designated persons, if there is reasonable cause to believe physical harm may otherwise result.

d. Prohibit the defendant from possessing or purchasing a firearm and ammunition for the duration of the order, upon a finding that the defendant may inflict bodily injury or death on the plaintiff. *See* A.R.S. § 13-3624(D).

4. *Service of an Emergency Order of Protection.*

a. The law enforcement officer who receives verbal authorization for an Emergency Order of Protection shall complete and sign the emergency order as instructed by the judicial officer. The law enforcement officer shall then give a copy of the Emergency Order of Protection to the plaintiff or appropriate third party.

b. The law enforcement officer shall arrange for service upon the defendant. After service of the Emergency Order of Protection on the defendant, the law enforcement officer shall file a certificate of service with the court and verbally notify the sheriff's office that a judicial officer has issued an Emergency Order of Protection. *See* A.R.S. § 13-3624(F).

5. *Duration.* An emergency order expires at the close of the next day of judicial business following the day of issuance, unless otherwise continued by the court. *See* A.R.S. § 13-3624(E). A petition for an Order of Protection may be filed the following business day.

**E. Injunction Against Harassment.** The judicial officer shall conduct an individual hearing with each plaintiff who requests an Injunction Against Harassment.

1. *Contents of Petition.* The petition shall allege a series of specific acts of harassment and the dates of occurrence. A series of acts means at least two events. *See* A.R.S. § 12-1809(C).

2. *Petition Verification.* A plaintiff must sign and swear or affirm to the truth of the petition before a judicial officer or other person authorized to administer an oath.

3. *Petition Review.* A judicial officer shall review the petition, any other pleadings on file and any evidence offered by the plaintiff, including any evidence of harassment by electronic contact or communication, to determine whether the order requested shall be issued *ex parte*.

4. *Issuance of Injunction Against Harassment*

a. *Findings Required.* The judicial officer shall issue an Injunction Against Harassment if there is a finding of reasonable evidence of harassment of the plaintiff by the defendant during the year preceding the filing or that good cause exists to believe that great or irreparable harm would result to the plaintiff if the injunction is not granted before the defendant or the defendant's attorney can be heard in opposition. *See* A.R.S. § 12-1809(E).

4. The service and registration requirements applicable to the original protective order also apply to a modified protective order. A modified protective order is effective upon service and expires one year after the date of service of the original protective order. *See* A.R.S. § §13-3602(L), 12-1809(J) and 12-1810(I).

5. If an Order of Protection or Injunction Against Harassment is modified and served, the sheriff in the county where the original Order of Protection or Injunction Against Harassment was registered shall be notified in writing within 24 hours after the court receives the Certificate or Acceptance of Service. *See* A.R.S. §§13-3602(M), 12-1809(K) and 12-1810(J). Notice of modification of a protective order shall be sent to the sheriff in the county where the original protective order was registered. The modification order shall be in writing and sent electronically via facsimile or e-mail, not by telephone, to the sheriff.

## Rule 8.  Contested Hearing Procedures

**A. Requesting a Hearing.**  At any time while a protective order or modified protective order is in effect, a defendant may request one hearing in writing. *See* A.R.S. § 13-3602(I).

1. A judicial officer shall hold a hearing at the earliest possible time.

a. If an Order of Protection grants exclusive use of the home, a judicial officer shall hold a hearing within five court business days of the request.

b. For all other protective orders, a judicial officer shall hold a hearing within 10 court business days of the request unless the judicial officer finds good cause to continue the hearing for a longer period of time.

**B. Notice of Hearing**. The court shall notify the plaintiff of the hearing. There is no statutory requirement for personal service of notice of the hearing.

**C. Court Security Measures.**  The court shall take reasonable measures to ensure that the parties and their witnesses at the hearing are not subject to harassment or intimidation in the courthouse or adjoining property. For each hearing, the judicial officer shall determine whether there is a need to have a law enforcement officer, a security officer, or a victim's advocate present to help ensure the hearing is orderly.

**D. Parties' Right to be Heard.**  The judicial officer shall ensure that both parties have an opportunity to be heard, to present evidence and to call and examine and cross-examine witnesses.

**E. Oath or Affirmation.**  The court shall administer an oath or affirmation to all parties and witnesses at all hearings.

**F. Standard of Proof.**  The plaintiff shall prove the case by a preponderance of the evidence, in order for a protective order to remain in effect as originally issued or as modified after the hearing.

# EXHIBIT C